UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY J. OGDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:14 CV 982 JMB |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**MEMORANDUM AND ORDER**

Gregory Ogden ("Plaintiff") brings this action for judicial review of the Commissioner's

final decision denying his application for Disability Insurance Benefits ("DIB"), under Title II of

the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for Supplemental Security

Income ("SSI"), under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.  All matters are pending

before the undersigned United States Magistrate Judge, with the consent of the parties, pursuant

to 28 U.S.C. § 636(c).  Because the final decision is supported by substantial evidence on the

record as a whole, it is affirmed.

I.    **PROCEDURAL HISTORY & SUMMARY OF DECISION**

On January 31, 2011, and February 11, 2011, Plaintiff filed applications for SSI and DIB

under the Act.  In his applications, Plaintiff claimed to have been disabled since December 5,

2010, due to a combination of physical and mental impairments.  Plaintiff's applications were

---

[1] This case is docketed as Ogden v. Social Security Administration. The Court notes that this is probably a
typographical error. The correct defendant should be Carolyn Colvin, the Acting Commissioner of the Social
Security Administration, because the Social Security Administration itself enjoys sovereign immunity. See
Nzongola v. Astrue, 863 F.Supp.2d 25, 29 (D.D.C. 2012). Therefore, pursuant to the Court's authority under Fed. R.
Civ. P. 25(d), the Court will substitute the correct named party.

denied, and he filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). On May 3, 2012, the ALJ held an administrative hearing on Plaintiff's claims. Plaintiff and a Vocational Expert ("VE") testified at the hearing. On October 25, 2012, the ALJ issued an unfavorable decision, finding that Plaintiff was not under a disability, as defined by the Social Security Act. (Tr. 6-26)[2]

In denying Plaintiff's claim of disability, the ALJ followed the familiar five-step sequential evaluation process for determining whether Plaintiff was disabled within the meaning of the Act. (Tr. 10-11) See 20 C.F.R. §§ 404.1520(a) and 416.920(a). At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity. At step two, the ALJ found that Plaintiff suffered from the following severe impairments: (1) seizure disorder; and (2) major depression. (Tr. 11) The ALJ also found that Plaintiff suffered from various physical impairments, none of which rose to the level of severity required for a finding of disability. (Tr. 12-15)

At step three, the ALJ concluded that Plaintiff's physical and mental impairments did not meet or equal the criteria for a listed impairment. As relevant to the present matter, the ALJ specifically considered Plaintiff's seizure disorder and mental impairments. The ALJ found that Plaintiff's seizure disorder was properly evaluated under the listing for convulsive epilepsy, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02, but that Plaintiff had not suffered from one or more seizures per month in spite of at least three months of prescribed treatment. (Tr. 15) Furthermore, in considering Plaintiff's mental impairments, the ALJ found Plaintiff had moderate restrictions in the activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Tr. 15-16)

_____

[2] References to "Tr." are to the administrative record filed by the Commissioner. (ECF. No. 13)

The ALJ proceeded to step four and articulated Plaintiff's residual functional capacity ("RFC") as follows:

> [T]he claimant has the residual functional capacity to perform work at all exertional levels, but with the following non-exertional limitations: he can occasionally climb stairs, and ramps; cannot climb ladders, ropes or scaffolds; must avoid concentrated exposure to the hazard of heights; can understand, remember, and carry out simple instructions and non-detailed tasks; can respond appropriately to coworkers and supervisors in a task-oriented setting where contact with others is casual and infrequent; should not work in a setting which includes constant or regular contact with the general public; and should not perform work which includes more than infrequent handling of customer complaints.

(Tr. 18)

At the administrative hearing, a vocational expert ("VE") testified with respect to a hypothetical question that tracked the ALJ's RFC. According to the VE, such a claimant could find work in the national economy as an oven loader or as a bakery worker. (Tr. 49-51) Plaintiff's counsel posed two additional hypothetical questions. The first hypothetical question included an additional limitation that the hypothetical claimant would be off task for up to 20 percent of a work week. The VE testified that such a person could not work as an oven loader or a bakery worker. The second hypothetical included an additional limitation that the hypothetical claimant would be absent from work more than three times per month. The VE testified that such a person also could not work as an oven loader or a bakery worker. (Tr. 51)

On the basis of the foregoing testimony, the ALJ concluded that Plaintiff could return to his past relevant work as an oven loader or a bakery worker. Therefore, the ALJ concluded at step 4 that Plaintiff was not disabled. (Tr. 19)[3]

---

[3] Upon review of the ALJ's written decision, the Court concludes that the ALJ considered the relevant medical and non-medical evidence in the record. Additional aspects of the ALJ's decisions are discussed below, in the context of the specific issues raised by Plaintiff in this Court.

Plaintiff filed a timely request for review by the Appeals Council.  On March 20, 2014, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's October 25, 2012 decision as the final decision of the Commissioner in this matter.  (Tr. 1-3)  Accordingly, Plaintiff has exhausted her administrative remedies and the matter is properly before this Court.

In his request for judicial review, Plaintiff raises two related issues regarding the ALJ's determination of his RFC.  First, Plaintiff asserts that the failed to properly consider the opinion evidence of his treating psychiatrist – Dr. John Canale, M.D. – when the ALJ assigned only little weight to Dr. Canale's opinions.  Plaintiff alleges that the ALJ failed to apply the required factors in discounting Dr. Canale's opinions.  Second, Plaintiff argues that Dr. Canale's opinions should have been accorded substantial or great weight.  As a result of these alleged errors, Plaintiff contends that the ALJ's decision denying benefits is not supported by substantial evidence and must be remanded.  (ECF No. 20)

The Commissioner, on the other hand, contends that the ALJ properly evaluated the opinion of Plaintiff's treating physician and therefore, that the ALJ's decision denying benefits is consistent with the Act, regulations, and applicable case law and is supported by substantial evidence in the record.  (ECF No.24)

Plaintiff does not take issue with the ALJ's determination of his severe impairments – seizure disorder and major depressive disorder.  Similarly, Plaintiff does not take issue with the fact that the ALJ did not include any exertional limitations in his RFC determination.  Rather, Plaintiff's arguments focus solely on how the ALJ considered the opinion evidence of his treating physician relative to his mental health condition.

Having reviewed the entire record, including all of the opinion evidence, and in light of controlling legal standards, the Court concludes substantial evidence supports the

Commissioner's decision. Contrary to Plaintiff's contention, the ALJ did not err in failing to give "substantial or great weight" to Dr. Canale's opinion. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007). The ALJ properly considered the entire medical record, including the opinions of consulting sources Drs. Singer and Spencer. See Perkins v. Astrue, 648 F.3d 892, 898 (8th Cir. 2011); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007); 20 C.F.R. § 404.1527(d)(1). The ALJ properly considered and discounted Plaintiff's credibility. Finally, the ALJ's articulation of Plaintiff's RFC is supported by substantial evidence. Hence, the ALJ was entitled to rely on the VE's testimony that Plaintiff could return to his past work as an oven loader or bakery worker.

## II.  SUMMARY OF EVIDENCE IN THE RECORD[4]

### A.  General History and Characteristics of Plaintiff

Plaintiff was born in 1960 in St. Louis, Missouri. Plaintiff graduated from high school and joined the workforce soon after. Plaintiff's primary, prior work experience was as a baker and bakery worker. Plaintiff left that work due to his hours and benefits being cut, not because of an alleged disability. Immediately prior to his alleged disability, Plaintiff worked as a bus driver and then as a cook at a nursing home. Plaintiff left his job as a bakery worker voluntarily. Plaintiff was terminated from his bus driver job for suspicion of drinking. Plaintiff was terminated from his nursing home position for failure to disclose a worker's compensation claim. Plaintiff has not engaged in substantial gainful activity since December 5, 2010, his alleged onset date.

Plaintiff has a history of alcohol abuse and non-compliance with the advice of his

---

[4] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's decision is supported by substantial evidence. The recitation of specific evidence in this Memorandum and Order is intended to provide context to the Court's decision.

doctors.  It is not entirely clear from the record whether or when Plaintiff stopped

drinking.  Plaintiff has a history of depression that dates at least to the time of his

mother's death in 2007.  Plaintiff also has a history of seizures.  Plaintiff alleges

disability due to depression, shoulder and elbow injuries, a seizure disorder, ulcer, and

high blood pressure.  Plaintiff's arguments to this Court focus entirely on his mental

health issues.

### B.     <u>Relevant Testimony at the May 3, 2012 Administrative Hearing</u>

#### *1.*     <u>*Summary of Plaintiff's Testimony*</u> (Tr. 33-47)

At the time of the hearing, Plaintiff was fifty-one years old, with a high school education.

From 1994 to 1997, Plaintiff worked as an industrial sprayer for Superior Home Products.  From

1998 to 2000, Plaintiff worked as a delivery man for Midwest Delivery, where he delivered

Avon products weighing as much as 75 pounds.  From 2000 to 2010,  Plaintiff worked at Haas

Bakery in multiple capacities.  Plaintiff testified that he worked on the production line making

bakery products and worked as an oven loader/unloader.  In response to the ALJ's questions

about reasons for leaving the Haas Bakery job, Plaintiff testified that he quit in July 2010

because his employer took away his healthcare and would give him only two days of work per

week.  In 2010, Plaintiff then worked as a school bus driver for about three months and then as a

cook at a nursing home facility for about two weeks.[5]

At the hearing, Plaintiff stated that, although he had problems with alcohol in the past, he

had not had any alcohol in over a year.  Furthermore, Plaintiff stated that his depression bothers

him on a daily basis because of his "anger and irritability and agitation and just not good with

others."  (Tr. 37)  Plaintiff further testified that, as a result of shoulder and elbow surgery, he has

---

[5] The ALJ surmised, and Plaintiff confirmed, that he was fired due to alcohol impairment.  (Tr. 43, 165)

a sharp burning pain whenever he lifts anything. According to Plaintiff, this pain persists when Plaintiff attempts to push or pull anything. Plaintiff further testified that he can stand for 20 minutes at a time, but after 20 minutes he experiences a sharp, stabbing pain that begins in his right hip and lower back. Plaintiff testified that he could walk only about 100 yards or sit for about an hour before the same pain begins. Plaintiff testified that he has chronic obstructive pulmonary disease ("COPD") and gets winded after walking up and down stairs.

Plaintiff testified that he had been seeing Dr. Canale for psychiatric issues, mainly depression. Dr. Canale prescribed medication, but Plaintiff stopped taking it because he did not believe it was working. Plaintiff testified that his depression causes anger problems, discomfort in crowds and around people, and problems trusting others. Therefore, Plaintiff claimed that he does not leave his house often, and spends most of his time in his room because he feels "isolated … too agitated or angry to do anything." (Tr. 46) Although Plaintiff had a seizure in February of 2011, he stated that his seizure disorder is controlled by medication, but that his medication causes dizziness and nausea. Furthermore, Plaintiff testified that he has trouble concentrating for long periods of time, and mainly spends his days watching television. Plaintiff also has trouble sleeping and sleeps between three to four hours per night.

### 2. *Summary of Vocational Expert's Testimony* (Tr. 48-52)

Vocational expert ("VE"), Tracy H. Young, M.A., heard Plaintiff's testimony and was given an opportunity to examine the record in the case. The VE testified in response to questions posed by the ALJ and Plaintiff's counsel.

The ALJ posed one hypothetical question to the VE. The hypothetical question tracked the limitations in the RFC noted above. In response to the hypothetical question, the VE testified that such a hypothetical claimant could find work in the national economy as an oven loader or

as a bakery worker.  (Tr. 49-51)

Plaintiff's counsel posed two additional hypothetical questions.  The first hypothetical question included an additional limitation that the hypothetical claimant would be off task for up to 20 percent of a work week.  The VE testified that such a person would not find work as either an oven loader or a bakery worker.  The second hypothetical included an additional limitation that the hypothetical claimant would be absent from work more than three times per month.  The VE testified that such a person would not be able to work as either an oven loader or a bakery worker.  (Tr. 51)

### C.    Relevant Medical Evidence before the ALJ

The medical evidence in the record shows that Plaintiff has a history of shoulder and elbow pain.  Plaintiff had surgery in 2006 for a tennis elbow which seemed to alleviate his pain.  (Tr. 329-330)  In 2008, Plaintiff had rotator cuff surgery and attended several months of rehabilitation therapy.  (Tr. 335-55, 377, 397-98)  Plaintiff has not identified any alleged errors regarding the ALJ's assessment of his physical or exertional limitations.  Therefore, the medical records regarding Plaintiff's physical limitations are discussed only briefly.

### 1.    *Dr. David Fagan  – Tesson Heights Orthopedics*

Plaintiff underwent surgery for tennis elbow on March 3, 2006.  Dr. David Fagan, M.D., at Tesson Heights Orthopedic and Arthroscopic Associates, performed the surgery and saw Plaintiff for a follow-up visit.  There were no complications with the surgery, and at the time of the follow-up visit, Plaintiff was able to lift a 50 pound bag with very little difficulty.  Although Dr. Fagan reported that it might be a year before Plaintiff's elbow was as strong as it had been prior to injury, he stated that Plaintiff had "healed nicely," was doing "well" and "needs no further follow up visits."  (Tr. 329-30)

### 2.    _Dr. Richard Howard – Orthopedic Specialists, P.C._

Plaintiff suffered a torn rotator cuff in late 2007.  On February 27, 2008, Dr. Richard Howard, D.O., performed surgery on Plaintiff's right shoulder.  Plaintiff underwent rehabilitation treatment at ProRehab for seventeen weeks.  Eight weeks after the surgery, Plaintiff was still limited, but making "satisfactory progress."  Fourteen weeks after the surgery, Plaintiff was only limited in overhead lifting and advised to continue rehabilitation for three more weeks.  Dr. Howard saw Plaintiff approximately seventeen weeks after the surgery and deemed the outcome of the surgery an "excellent result. " Dr. Howard stated that "[t]he patient has reached maximum medical improvement.  He is released to full duty, with no restrictions.  No further follow-up is required." (Tr. 376-405)

### 3.    _Dr. Gary Meltz – St. Joseph Health Center_

Plaintiff saw Dr. Gary Meltz, M.D., of Saint Joseph Health Center multiple times from April to August of 2008.  At his first meeting with Plaintiff, Dr. Meltz noted that Plaintiff was under a lot of stress and apparently still grieving the death of his mother several months earlier.  Dr. Meltz noted that Plaintiff had no prior medical history of depression.  Dr. Meltz also examined Plaintiff's shoulders.  Dr. Meltz 's findings with respect to Plaintiff's right shoulder were consistent with Dr. Howard's assessments, but Dr. Meltz further found that Plaintiff also suffered from pain in his left shoulder, and he ordered an MRI.  The MRI suggested Plaintiff had mild tendinopathy of the supraspinatus tendon.  On Plaintiff's second visit, Dr. Meltz prescribed an increased dosage of Effexor to treat Plaintiff's depression and insomnia.  During Plaintiff's third and final visit, Dr. Meltz noted that Plaintiff was still having difficulty sleeping and had pain in both shoulders, but that Plaintiff had not taken the increased Effexor dosage as prescribed.  (Tr. 406-09)

## 4.    *Dr. John Canale – Treating Psychiatrist*

Between July 20, 2010, and May 9, 2012, Plaintiff was seen several times by Dr. John Canale, M.D. (Tr. 309-13, 410-21, 423-25)  The record indicates that Dr. Canale treated Plaintiff for mental health and medication management issues.

Plaintiff first saw Dr. Canale at the St. Charles Psychiatric Association on July 20, 2010. (Tr. 416-21)  During his initial exam, Dr. Canale noted that Plaintiff had a history of depression that "seems to be worse over the past couple of years, since the death of his mother."  (Tr. 416)  Plaintiff reported that he was working two days a week as a baker and had put in employment applications at numerous places, but was unable to find full-time employment.  (Id.)  Dr. Canale opined that Plaintiff was suffering from depression and prescribed medication.  (Tr. 417)

Dr. Canale had contact with Plaintiff relevant to treatment approximately ten times in 2010, with their last meeting occurring on December 10, 2010, shortly after Plaintiff's alleged onset date.[6]  (Tr. 418-421)  During this time period, the record tends to indicate that Plaintiff's condition generally improved while he was compliant with his treatment and medications, but there were setbacks.

Dr. Canale's notes for September 9, 2010, appear to indicate that Plaintiff reported obtaining employment would be driving a truck.  (Tr. 418)[7]  On September 22, 2010, however, Plaintiff reported to Dr. Canale that he had been fired from his job and was feeling stress from everyone around him "pushing him over the edge."  (Tr. 418)  During an October 19, 2010

---

[6] Plaintiff had appointments with Dr. Canale on the following dates:  August 11, 2010, September 9, 2010, October 19, 2010, October 27, 2010, November 12, 2010, November 19, 2010, and December 10, 2010.  Dr. Canale spoke on the phone either with Plaintiff or with a member of Plaintiff's family on the following dates: September 22, 2010, October 25, 2010, and November 30, 2010.

[7] Dr. Canale's handwritten notes appear to read, "did get a job at Schnuck's bakery."  (Tr. 418) Plaintiff did not mention this job in his testimony before the ALJ.  (Tr. 33-36)

appointment, Plaintiff reported that he had found a job driving a school bus but was still grieving his mother's death. Dr. Canale prescribed Ambien to help Plaintiff sleep and suggested that Plaintiff needed to find another part-time job. A about a week later, Plaintiff's father called Dr. Canale to report that Plaintiff had lost his bus-driving job and was abusing alcohol.

At an appointment on November 12, 2010, Dr. Canale addressed the cost of Plaintiff's medications by suggesting alternate medications. Dr. Canale also recommended that Plaintiff go to CenterPointe Hospital for alcohol dependency treatment. Plaintiff entered CenterPointe and participated in a five day clinical assessment for "inability to function."

On November 30, 2010, Plaintiff reported to Dr. Canale's office that he was working at St. Peter's Manor as a dining cook, and that he was "doing much better on Zoloft [and] Restone." (Tr. 420) On December 10, 2010, Plaintiff saw Dr. Canale at his office. Although Plaintiff reported that he had lost his job, Dr. Canale's handwritten progress notes appear to indicate that Plaintiff was doing better on his medication and that he was "not depressed." (Tr. 421) Plaintiff failed to show for his scheduled December 22, 2010 appointment with Dr. Canale.

Dr. Canale continued to treat Plaintiff in 2011,[8] after Plaintiff was hospitalized for ten days at CenterPointe Hospital for treatment of depression and alcohol abuse. (Tr. 309-11, 423) During a January 19, 2011 appointment, Dr. Canale noted that Plaintiff continued struggle with alcohol and that Plaintiff reported drinking the night before that appointment. Dr. Canale also noted that Plaintiff reported feeling "very depressed." (Tr. 309) Furthermore, Plaintiff reported feelings of paranoia, a rape 25 years earlier, and that he was unable to work. (Id.) Dr. Canale prescribed Zoloft and recommended that Plaintiff apply for disability.

---

[8] Dr. Canale had contact with Plaintiff on seven occasions in 2011. Dr. Canale saw Plaintiff in his office on January 19, February 19, April 1, June 30, and December 15 of 2011. Plaintiff, or his family, contacted Dr. Canale by telephone on January 28 and February 8 of 2011.

On February 8, 2011, Plaintiff's sister reported to Dr. Canale office that Plaintiff had been hospitalized after suffering from a seizure. Dr. Canale's notes indicate that Plaintiff had a seizure in the 1980s and took Dilantin for a while as a result. Following the seizure, Dr. Canale next saw Plaintiff on February 16, 2011, at which time Dr. Canale considered the EEG and CAT scan performed after Plaintiff's seizure. There is no indication in the record that Dr. Canale considered Plaintiff to have brain damage or a brain defect. Dr. Canale also noted that Plaintiff had been issued a citation for DUI after taking prescription drugs. Dr. Canale observed that Plaintiff needed to go to "AA" (Alcoholics Anonymous). (Tr. 310) Dr. Canale's progress notes for April 1, 2011, indicate that Plaintiff lost his driver's license, was not doing much, and was applying for disability. (Tr. 311)

Dr. Canale's progress notes for June 30, 2011, suggest that Plaintiff was improving overall and had stopped drinking. Dr. Canale prescribed anti-psychotic medications and noted that Plaintiff applied for Social Security.

There is a significant gap in treatment from June to December 2011. Dr. Canale's notes for December 15, 2011, however, indicate that Plaintiff stopped taking his medication three months earlier, that he was not driving, but wanted to, and that he was not drinking. (Tr. 423) Dr. Canale increased the dosage of prescribed medication and recommended that Plaintiff take those medications. These December notes indicate that Plaintiff was having problems with his brother. Dr. Canale adjusted Plaintiff's medications. (Id.)

The record indicates that Dr. Canale had contact with Plaintiff four times in 2012.[9] Dr. Canale's January 16, 2012 notes reported that Plaintiff was "depressed, agitated" and having problems with his father and brother. Dr. Canale increased dosages of Plaintiff's medications.

_____

[9] Plaintiff saw Dr. Canale for appointments on January 16, February 27, and April 9 of 2012. Plaintiff contacted Dr. Canale by telephone on March 13, 2012.

(Tr. 424)  At a February 27, 2012 appointment, Plaintiff reported to Dr. Canale that he was not drinking alcohol, but was "still very angry" and was "waiting for disability."  (Tr. 424)

On March 13, 2012, Plaintiff called Dr. Canale's office and reported to a nurse that although he was taking his medications, his anger was "off chart," that "punishment has lasted long enough," that his father was not giving him any money, and that he was "so angry and gonna explode."  (Tr. 425)  Dr. Canale saw Plaintiff on April 9, 2012, and noted that Plaintiff was "still agitated, depressed."  Dr. Canale further noted that Plaintiff was feeling "hopeless," and had an upcoming disability hearing.  Dr. Canale increased the dosages of Plaintiff's prescribed medications.  (Tr. 425)

Dr. Canale also submitted two opinions regarding Plaintiff's mental RFC.  Dr. Canale's opinions are outlined below in the context of the mental health opinion evidence in the record.

### 5.    *Other Medical Evidence of Record*

As mentioned briefly above, Plaintiff was treated on several occasions at CenterPointe Hospital and Saint Joseph's Health Center between November 2010 and February 2011.  On November 6, 2010, Plaintiff was hospitalized at Saint Joseph's Health Center following an Ambien overdose.  Plaintiff was discharged after it was determined that he took eight Ambien in an effort to sleep, not as a suicide attempt.  (Tr. 219, 426)

Plaintiff was admitted to CenterPointe Hospital on November 19, 2010, for "inability to function" based on Dr. Canale's recommendation.  (Tr. 240-64)  Staff and doctors at the hospital conducted an extensive medical exam of Plaintiff, the results of which were consistent with the medical evidence reported above.  (Tr. 240-54)  Upon discharge on November 24, 2010, Plaintiff agreed to attend outpatient chemical dependency treatment and would look for work.  (Tr. 240-41)  Significantly, the treatment notes from CenterPoint indicate that Plaintiff "seemed

somewhat comfortable when he thinks he is unobserved, but complained of significant symptoms when in front of staff." (Tr. 240)

Plaintiff was treated at CenterPointe Hospital again on January 3, 2011, for intensive outpatient treatment (IOP) related to depression, alcohol abuse, and medication misuse. (Tr. 219) Plaintiff's apparent misuse of the prescription drug Restoril (a sleeping aid) had resulted in a DUI a few days before he was admitted. (Tr. 222) During treatment, Plaintiff had group meetings and met with his family. It was noted that Plaintiff had difficulty taking responsibility for his own actions. Plaintiff was discharged on January 17, 2011, "in part for financial strain and seemingly reached maximum benefit for current episode." (Tr. 219-24)

Plaintiff was again admitted to CenterPointe Hospital on January 19, 2011, after pronouncing that he "was suicidal." During the intake process and upon admittance, Plaintiff acknowledged that he had previously stated that he was suicidal, but denied thoughts of suicide, attributing his earlier statements to anger. At times during the treatment, Plaintiff stated that he had an alcohol abuse problem, but at other times he stated that he did not have an alcohol problem. At the time of discharge, Dr. Howard Illivicky, a physician at CenterPointe, stated that Plaintiff was "without suicidal ideation, without psychosis, without obvious deficits and he is discharged in stable condition." (Tr. 225)

Plaintiff was treated at Saint Joseph's Health Center on February 8, 2011, following a tonic-clonic seizure lasting 3-5 minutes. (Tr. 265-92) Plaintiff had been living with his father, who attested that Plaintiff had not recently been abusing alcohol. A CAT scan and an EEG performed at that time showed no acute changes. The risk of recurrent seizures, likely due to a small vessel ischemic disease, was deemed high. It was recommended that Plaintiff be prescribed and maintained on an anti-epileptic medication.

D.    **Mental Health Opinion Evidence**

The ALJ considered opinions from three different medical evaluators.  Dr. Canale,

Plaintiff's treating psychiatrist, provided opinions in two forms:  (1) a Mental Residual

Functional Capacity Assessment form, dated April 24, 2012, which was accompanied by a brief

letter (Tr. 412-15); and (2) a Mental Residual Functional Capacity Questionnaire form, dated

June 1, 2012 (Tr. 435-40).  Dr. Joan Singer, Ph.D., a state agency psychological consultant (Tr.

19), submitted a Psychiatric Review Technique form, and a Mental Residual Functional Capacity

Assessment, both dated April 21, 2011.  (Tr. 314-28)  Dr. Thomas Spencer, Psy.D., conducted a

consultative psychological examination of Plaintiff on June 1, 2012, and submitted a detailed

evaluation , along with a Medical Source Statement of Ability to Do Work Related Activities

(Mental).  (Tr. 426-34)  The ALJ assigned "great weight" to Dr. Spencer's opinion (Tr. 19),

"significant weight" to Dr. Singer's opinion (id.), and little weight to Dr. Canale's opinion (Tr.

20-21).

*1.*    ***Dr. Canale***

On April 24, 2012, Dr. Canale wrote a letter generally describing Plaintiff's medical

situation and completed a Mental Residual Functional Capacity Assessment form.  Dr. Canale's

letter stated, in pertinent part:

> [Plaintiff] has a several year history of depression.  Over the past two to three
> years, [Plaintiff] has had a worsening of his symptoms.  He has been hospitalized
> and has lost jobs.  He is currently unable to work, and remains depressed,
> agitated, irritable and he is unable to handle any stress.  He is supported by his
> father, with whom he lives.  Due to his extreme irritability and agitation, he is
> unable to be around others peacefully.  I believe [Plaintiff] is disabled and should
> receive disability benefits.

(Tr. 412)

In the mental RFC assessment accompanying his letter, Dr. Canale opined that Plaintiff

was "Markedly Limited" in nearly every category related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 413-14) Within the category of sustained concentration and persistence, Dr. Canale opined that Plaintiff was moderately limited in his ability to make simple work-related decisions. (Tr. 413) Within the category of social interaction, Dr. Canale opined that Plaintiff was moderately limited in his ability to ask simple questions or request assistance. (Tr. 414) The form on which Dr. Canale submitted his April 24, 2012 opinion did not define marked or moderate limitations. It is noted, however, that "marked" limitation was the most severe limitation available on the form.[10] Other than his summary letter, Dr. Canale's opinion was not accompanied by any diagnostic information or meaningful explanations.

Dr. Canale provided a second opinion on June 1, 2012. Dr. Canale's second opinion was in the form of a questionnaire. (Tr. 435-40) In this questionnaire, Dr. Canale included his diagnoses (Tr. 435) and other explanatory information that was not included in his April 24, 2012 opinion. Dr. Canale's notes indicate that he had been treating Plaintiff since July 2010, and that his prognosis was "guarded." (Id.) Dr. Canale opined that no physical impairment contributes to Plaintiff's mental health limitations, and that Plaintiff had not responded well to many different trials of anti-depressants and mood stabilizers. (Id.) Dr. Canale listed, in checklist form, eighteen different symptoms and signs, including: difficulty thinking or concentrating; easy distractability; generalized persistent anxiety; impairment in impulse control; memory impairment; and mood disturbance. (Tr. 436-37) Dr. Canale concluded that Plaintiff's impairments were consistent with the symptoms and functional limitations found in his opinion.

---

[10]   The form included three substantive ratings – not significantly limited, moderately limited, and markedly limited. The form also included two exclusion categories – no evidence of limitation, and not reliable on available evidence. (Tr. 413)

(Tr. 437)

Dr. Canale's June 1, 2012, opinion also rated Plaintiff's mental RFC in the categories of (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation.[11]  (Tr. 438-39)  Regarding understanding and memory, Dr. Canale rated Plaintiff as having marked limitations two of three categories, with a mild limitation in Plaintiff's ability to understand and remember very short and simple instructions.  (Tr. 438)  Regarding sustained concentration and persistence, Dr. Canale rated Plaintiff as having extreme limitations in two categories, marked limitations in four categories, and mild limitations in two categories (ability to carry out very short / simple instructions, and ability to make simple work-related decisions).  (Tr. 438)  As for social interaction, Dr. Canale opined that Plaintiff had marked limitations in four of five categories, with a mild limitation relative to his ability to ask simple questions or request assistance.  (Id.)  As for Plaintiff's adaptation abilities, Dr. Canale concluded that Plaintiff had marked limitations in three of the five categories, a moderate limitation in his ability to travel in unfamiliar places or use public transportation, and a mild limitation in his ability to be aware of hazards and take normal precautions.  (Tr. 439)

Dr. Canale opined that Plaintiff would not be able to work eight hours, even with breaks, would miss more than four days of work per month, and that Plaintiff had no good days, only bad days.  (Tr. 439)  Dr. Canale also reported that Plaintiff had experienced three episode of decompensation within twelve months, each lasting at least two weeks long.  (Id.)  Dr. Canale opined that even a minimal increase in Plaintiff's mental demands or a change in his environment "would be predicted to cause [Plaintiff] to decompensate," (Tr. 439-40), and that Plaintiff completely lacked the ability to function independently outside the area of his home (Tr.

---

[11]  In this form, limitations were categorized as none, mild, moderate, marked, or extreme, with definitions provided for each category.  (Tr. 437)

440).  Dr. Canale opined, however, that Plaintiff could manage his own benefits.  (Id.)

## 2. *Dr. Joan Singer – Independent RFC*

Dr. Joan Singer, M.D., a state agency psychological consultant, reviewed Plaintiff's mental health history.  On April 21, 2011, Dr. Singer issued her opinion regarding Plaintiff's condition in a psychiatric review technique form, and an opinion regarding Plaintiff's RFC in a mental RFC assessment form.  (Tr. 314-28)  Dr. Singer's evaluation specifically focused on the conditions of major depressive disorder and alcohol abuse.  Dr. Singer found that Plaintiff had "moderate" limitations related to: restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  Furthermore, Dr. Singer found that Plaintiff had "one or two" episodes of decompensation, each of an extended duration.  (Tr. 322)

In her notes accompanying the psychiatric review technique, Dr. Singer noted Plaintiff's history of alcohol abuse, but that he reportedly had been clean for 60 days and that a DUI was the result of the misuse of a prescription drug (Restoril).  Dr. Singer noted Plaintiff's non-compliance with his abstinence and treatment and that his condition would likely improve with abstinence and compliance with treatment.  Dr. Singer noted Plaintiff's history of depression, sadness, and trouble sleeping.  She also noted that Plaintiff helped around the house and cared for his father, with whom he lived.  Plaintiff fixed meals and did housework, and shopped for food weekly.  Plaintiff did not spend time with others and had problems getting along with people.  Dr. Singer concluded that Plaintiff's allegations were "partially credible."  (Tr. 324)

In her mental RFC assessment, Dr. Singer found Plaintiff moderately limited in most categories related to understanding and memory, sustained concentration and persistence, social

interaction, and adaptation.[12]  Dr. Singer found Plaintiff not significantly limited in his abilities to (1) understand and remember very short and simple instructions, (2) carry out very short and simple instructions, and make simple, work-related decisions.  (Tr. 326-27)

### 3. *Dr. Thomas J. Spencer – Associated Behavioral Consultants*

Dr. Thomas J. Spencer, Psy. D. conducted a psychological evaluation of Plaintiff on June 1, 2012, and prepared a written report of that evaluation, along with a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 426-29)  In conducting his evaluation, Dr. Spencer relied on a substantial volume of Plaintiff's mental health history records, including a form with claimant's allegations, records from CenterPointe Hospital, records from St. Joseph Health Center, records from St. Charles Psychiatric Associates, and a clinical interview with Plaintiff.  (Tr. 426)

Plaintiff's chief complaint to Dr. Spencer was that his prior work at a bakery had been "down to two days a week and then [his] brother and sister were on [him] to get a better job." (Tr. 426)  During the examination, Plaintiff reiterated his feelings of depression consistent with Dr. Canale's report.  Plaintiff reported he had been depressed since his mother's death in 2007, and described attempts to treat his depression by seeing a psychiatrist and taking various medications.  Plaintiff stated that there had been little improvement in his mood and that he felt he had two options in life – to commit suicide or commit a crime and wind up in jail.  Plaintiff described his daily routine, stating that he has trouble sleeping and waking up in the morning, and spends his days watching television.  Furthermore, Plaintiff stated that he had poor concentration and attention as well as "extreme" anger.  (Tr. 426-27)  Dr. Spencer observed that

---

[12]  The form provide by Dr. Singer listed three substantive ratings – not significantly limited, moderately limited, and markedly limited, and two exclusion categories – no evidence of limitation, and not reliable on available evidence.  (Tr. 326)

Plaintiff had "a couple" of decompensation episodes in the past year.

Plaintiff advised Dr. Spencer that he lost his driver's license due to a DWI and that he lacks the money to get his license reinstated. (Tr. 427) Plaintiff stated that he had been "sober 'like a year, a year or two months or three months.'" (Tr. 428)

Plaintiff explained to Dr. Spencer that he most recently worked as a cook at a nursing home, but was let go because he had failed to disclose worker's compensation claims he had made. (Tr. 428) Plaintiff noted that, prior to the nursing home job, he drove a school bus for a couple of months but was "fired after coming to work with alcohol on his breath." (Id.) Plaintiff advised he left his bakery job because they cut his hours. (Id.)

Dr. Spencer noted that Plaintiff had fair eye contact and his speech was within normal limits. He stated that Plaintiff began to groan as the interview wore on, "although this seemed forced." Plaintiff was "questionably cooperative" and his "insight and judgment [were] questionable as well." Plaintiff reiterated that he felt sad, hopeless, and angry but denied thoughts of suicide or homicide. Dr. Spencer observed that Plaintiff was alert and oriented to person, place, time and event. Additionally, Dr. Spencer noted that Plaintiff appeared to be of low average to average intelligence, did not appear to have impairment in long-term memory, and demonstrated a "decent working knowledge of social norms." Finally, Plaintiff was able to spell forward and backward, complete simple arithmetic, and completed serial threes taking an excessive time to do so. (Tr. 428-29)

Dr. Spencer diagnosed Plaintiff with a mood disorder, not otherwise specified. Dr. Spencer found Plaintiff suffered from alcohol dependence, which was in remission per Plaintiff, and that Plaintiff had a history of polysubstance abuse. Dr. Spencer assigned Plaintiff a GAF between 50-55. Dr. Spencer also noted that Plaintiff had problems related to his primary support

system, occupational problems and economic problems.  Finally, Dr. Spencer concluded that

Plaintiff "needs assistance in managing his benefits."  (Tr. 429)

### III.    <u>STANDARD OF REVIEW & LEGAL FRAMEWORK</u>

To be eligible for DIB and SSI benefits under the Social Security Act, a claimant must

prove that he is disabled.  <u>See</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker</u>

<u>v. Sec'y of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  Under the Act, a

disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a

disability "only if his physical or mental impairment or impairments are of such severity that he

is not only unable to do his previous work but cannot, considering his age, education and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  <u>See</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S.

137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ

follows 'the familiar five-step process' to determine whether an individual is disabled…. The

ALJ consider[s] whether:  (1) the claimant was employed; (2) she was severely impaired; (3) her

impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant

work; and if not, (5) whether she could perform any other kind of work."  <u>Martise v. Astrue</u>, 641

F.3d 909, 921 (8th Cir. 2011) (quoting <u>Halverson v. Astrue</u>, 600 F.3d 922, 929 (8th Cir. 2010)).

<u>See</u> <u>also</u> <u>Bowen</u>, 482 U.S. at 140-42 (1987) (explaining the five-step process).

The Eighth Circuit has emphasized that a district court's review of an ALJ's disability

determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); 42 U.S.C. § 405(g).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision." Id. See also Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.  The credibility findings made by the ALJ.
2.  The claimant's vocational factors.
3.  The medical evidence from treating and consulting physicians.
4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5.  Any corroboration by third parties of the claimant's impairments.
6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

See Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

"If, after reviewing the entire record, it is possible to draw two inconsistent positions,

and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed.  Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012).  The decision may not be reversed merely because substantial evidence also could support a contrary outcome.  See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).  Rather, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence in the record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

IV.    **ANALYSIS OF ISSUES PRESENTED FOR REVIEW**

In his brief, Plaintiff raises two related issues, each of which challenges the ALJ's RFC determination.  Plaintiff contends that (1) the ALJ erred in weighing the mental health opinion evidence of his treating physician, Dr. Canale, and (2) the ALJ should have given Dr. Canale's opinions substantial or great weight.  Plaintiff has not taken issue with the ALJ's determination at step two as to Plaintiff's severe impairments.   Nor has Plaintiff taken issue with the ALJ's conclusion that Plaintiff retained the RFC to perform work at all exertional levels.

A.    **The ALJ's Adverse Credibility Determination**

The Court first addresses the ALJ's adverse credibility determination.  Although Plaintiff has not raised a specific challenge in this regard, the evaluation of Plaintiff's credibility is necessary to a full consideration of the ALJ's RFC determination.  See Wildman, 596 F.3d at 969 (explaining that an "ALJ's determination regarding [a claimant's] RFC was influenced by

[the ALJ's] determination that [claimant's] allegations were not credible") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)).  Moreover, the Eighth Circuit has instructed that, in the course of making an RFC determination, the ALJ is to consider the credibility of a claimant's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  See also 20 C.F.R. §§ 404.1529, 416.929.  The factors identified in Polaski include:  a claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of his medication; treatment and measures other than medication he has received; and any other factors concerning his impairment-related limitations.  See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929.  An ALJ is not, however, required to discuss each Polaski factor and how it relates to a claimants's credibility.  See Partee v. Astrue, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility").

This Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ.  See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"); Pearsall, 274 F.3d at 1218.

In this case, The ALJ concluded that Plaintiff's "statements concerning the intensity,

persistence and limiting effects of these symptoms [were] not credible to the extent they are inconsistent with the [ALJ's RFC] assessment." (Tr. 22)[13] This determination is important because Dr. Canale's opinions, no doubt, relied in part on Plaintiff's subjective complaints.

The ALJ gave sufficient reasons for his adverse credibility finding. The ALJ expressly considered the requirements of Polaski and 20 C.F.R. §§ 404.1529, 416.929. (Tr. 22) The ALJ supported his adverse credibility determination with a review of numerous factors. The ALJ noted that Plaintiff was not compliant with his treatment. For example, Plaintiff discontinued medications without permission. Similarly, the record suggests that Plaintiff's condition improved with compliance. The record indicates that Plaintiff received no treatment between June 2011 and December 2011. (Tr. 423) Plaintiff resumed treatment with Dr. Canale after he stopped taking his medications. See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (failure to follow prescribed course of treatment may be weighed against claimant's credibility when assessing subjective complaints).

The ALJ further noted that Plaintiff made numerous, unsubstantiated and inconsistent allegations regarding his limitations. (Tr. 24) The record supports the ALJ's finding in this regard with regard to Plaintiff's physical and mental limitations. For example, records from CenterPoint hospital indicate that, "unfortunately, [Plaintiff] seemed somewhat comfortable when he is unobserved, but complained of substantial symptoms in front of staff." (Tr. 240) Moreover, the ALJ correctly noted that Plaintiff's own work history undercuts his allegations of disabling impairments. Plaintiff left his prior work for reasons other than physical or mental disabilities. (Tr. 25) See Ramirez v. Barnhart, 292 F.3d 576, 581 n.4 (8th Cir. 2002) (explaining that, while not dispositive itself, the ALJ may properly consider a claimant's financial

---

[13] The ALJ's credibility determination applied to Plaintiff's physical and mental limitations. (Tr. 22-23)

motivations in making a credibility determination).

In reviewing the record in this case, therefore, the Court is satisfied that the ALJ complied with the standards outlined in <u>Polaski</u> and did not err in finding Plaintiff's subjective allegations less than credible.

**B.      The ALJ's RFC Determination and Weighing of Opinion Evidence**

Substantial evidence on the record as a whole supports the ALJ's RFC determination.  In making this determination, the Court is mindful that it is not free to simply re-weigh the evidence. <u>See</u> <u>McNamara</u>, 590 at 610 (a reviewing court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").  An ALJ's decision does not fall outside the acceptable zone of choice simply because the reviewing court might have reached a different conclusion.  <u>See</u> <u>Buckner</u>, 646 F.3d at  556.

### *1.      Legal Background – RFC Analysis & Opinion Evidence*

A claimant's RFC is the most that claimant can do despite their limitations.  20 C.F.R. § 404.1545(a)(1).  In determining a claimant's RFC, the ALJ should consider "all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [claimant's] limitations."  <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (internal quotations omitted).  While the RFC determination occurs at step four, where Plaintiff has the burden of proof, the Eighth Circuit has explained that the ALJ has primary responsibility for determining the RFC.  <u>Id.</u>

In determining a claimant's RFC, an ALJ must at least consider a treating physician's opinion(s).  Under the Commissioner's regulations, a treating physician's opinion is ordinarily afforded controlling weight.  <u>See</u> 20 C.F.R. § 404.1527.  However, "[a]n ALJ may discount or

even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where the treating physician renders inconsistent opinions that undermine the credibility of such opinions." Perkins, 648 F.3d at 897-98 (internal quotations omitted). Similarly, "[a]n ALJ may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'" Martise, 641 F.3d at 925 (quoting Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009)). When comparing a treating physician's assessment to that of an independent physician's, the ALJ must give "controlling" weight to a treating physician's opinion if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Wagner v. Astrue, 499 F.3d 848-59 (8th Cir. 2007); Social Security Ruling (SSR) 96-2p (directing that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if … it is inconsistent with the other substantial evidence in the case record"). Additionally, "'[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'" Wildman, 596 F.3d at 964 (quoting Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)).

### 2. *Analysis*

In this case, in formulating Plaintiff's RFC and making the ultimate decision on disability, the ALJ gave "great weight" to the medical opinion of Dr. Spencer, an independent medical examiner, and "significant weight" to the medical opinion of Dr. Singer, and "little weight" to the medical opinion of Dr. Canale. (Tr. 19-21). The relevant opinion evidence is summarized in considerable detail above.

Plaintiff first takes issue with the manner in which the ALJ addressed the opinion

evidence.  Plaintiff next contends that the ALJ erred in assigning little weight, rather than substantial or great weight, to Dr. Canale's opinions.  These are closely related issues.

Regarding the ALJ's decision to accord "little weight" to Dr. Canale's opinions, Plaintiff acknowledges that the ALJ "back[ed] up this decision by stating that Dr. Canale's opinions are inconsistent with his own treatment notes and other medical evidence in the record, which, if true, is a valid reason for giving [those opinions] less weight."  (ECF No. 20 at 8)  According to Plaintiff, however, the ALJ committed reversible error by failing to apply the factors in 20 C.F.R. § 404.1527 and 416.927 in weighing Dr. Canale's opinions.  (Id.)  Unfortunately, Plaintiff does not attempt to explain which factors the ALJ failed to apply, leaving the Court to forage through the regulations and record to determine which factors, if any, might be lacking.

The factors for weighing medical opinions are identified in 20 C.F.R. §§ 404.1527(c)[14] and 416.927(c).  The factors are identical in each section, with § 404.1527(c) directed to DIB claims, and § 416.927(c) directed to SSI claims.  The factors identified for weighing medical opinions are:

> (1) the examining relationship, with more weight generally accorded examining over non-examining sources;

> (2) the treatment relationship, with more weight generally accorded treating sources, and including a consideration of the length of the relationship, as well as the nature and extent of the relationship;

> (3) the supportability of the opinion, with more weight accorded an opinion accompanied by relevant evidence, "particularly medical signs and laboratory findings;"

> (4) the consistency of the opinion relative to the record as a whole;

> (5) the specialization of the source, with more weight accorded to sources

---

[14]  Plaintiff's argument references § 404.1527(d), which relates to opinions reserved to the Commissioner.  The Court believes Plaintiff intended to refer to § 404.1527(c), which discusses how the agency weighs medical opinions.

who provide opinions "related to his or her area of specialty;" and

(6) other factors that tend to support or contradict the opinion.

See 20 C.F.R. §§ 404.1527(c) and 416.927(c).

Having reviewed these factors, and having compared them to the ALJ's written decision, the Court concludes that the ALJ did, in fact, comply with the agency's regulations regarding weighing medical evidence. There is no allegation that the ALJ failed to consider all relevant sources. Likewise, Plaintiff does not, and cannot, take issue with the ALJ's weighing analysis, to the extent the ALJ declined to give any weight to Dr. Canale's opinion on the ultimate issue of disability. (Tr. 21) See 20 C.F.R. §§ 404.1527(d) and 416.927(d); Ellis v. Barnhart, 392 F.3d 988, 994-95 (8th Cir. 2005).

Upon review of the ALJ's written decision, it is apparent that the ALJ considered the above-noted factors in assessing Dr. Canale's opinions regarding Plaintiff's mental RFC limitations. The ALJ understood that Dr. Canale was a treating source who had examined and treated Plaintiff on numerous occasions. (Tr. 20) The ALJ specifically considered the supportability of Dr. Canale's opinions, noting that several of the "assessed symptoms and limitations [were] unsupported by the medical evidence of record." (Id.) As for consistency, the ALJ gave considerable attention to the consistency of Dr. Canale's opinions internally, relative to his treatment notes, and relative to the record as a whole. (Id.) Further, the ALJ clearly recognized that Dr. Canale was a psychiatrist, implying that he understood the relevant opinions were provided within Dr. Canale's area of expertise. Finally, although Plaintiff does not identify what "other factors" the ALJ should have considered, the ALJ considered Plaintiff's credibility, and in that context also considered evidence regarding his relationship with Dr. Canale. (Tr. 23-24) Accordingly, to the extent Plaintiff's request for judicial review rests on an argument that

the ALJ failed to apply the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c), that argument is refuted by the record.

Apart from the procedural aspects of the ALJ's weighing of the opinion evidence, Plaintiff also argues that the ALJ should have given Dr. Canale's opinions substantial or great weight. This presents a closer question than Plaintiff's first argument. The Court concludes, however, that the ALJ provided several legitimate reasons, each supported by evidence in the record, for discounting Dr. Canale's opinion relative to other opinion evidence in the record. In particular, the ALJ found that Dr. Canale's opinions were internally inconsistent, inconsistent with his own treatment notes, and inconsistent with other medical evidence in the record, including Plaintiff's own testimony. (Tr. 20) These are legally sufficient reasons to discount even a treating physician's opinions. See Perkins, 648 F.3d at 897-98; Martise, 641 F.3d at 925; Krogmeier, 294 F.3d at 1024; Andrews v. Colvin, No. 14-3012, 2015 WL 4032122 at *4 (8th Cir. July 2, 2015).

As an initial matter, the ALJ would arguably have been justified in discounting Dr. Canale's first opinion due to its lack of support or explanation. That opinion was completed in a conclusory and checklist fashion, with no meaningful explanation. See Wildman, 596 F.3d at 964. The ALJ, however, considered that opinion along with Dr. Canale's June 1, 2012, opinion, which included more diagnostic and background information in support. (Tr. 20)

The record supports the ALJ's conclusion that Dr. Canale's opinions were inconsistent with other substantial medical evidence in the record. Plaintiff does not address this factor in his arguments. Prior to discounting Dr. Canale's opinions, the ALJ specifically considered the opinions of examining source Dr. Spencer, and reviewing source Dr. Singer. There can be little doubt that the opinions of Drs. Spencer and Singer conflicted with Dr. Canale's opinions in

several substantial aspects. As the ALJ noted, Dr. Canale opined that Plaintiff had marked or extreme limitations in almost every category relative to basic mental work activities. In contrast, Drs. Spencer and Singer concluded that Plaintiff's limitations were mostly moderate. (Tr. 326-27, 426-33) Dr. Spencer's opinion, which was prepared in connection with a thorough psychological examination of plaintiff and included a detailed review of Plaintiff's mental health history (Tr. 426), was completed at about the same time as Dr. Canale's opinions. The record also showed that Plaintiff's subjective complaints were not fully credible.[15]

The record also supports the ALJ's conclusion that Dr. Canale's opinions were inconsistent with his own treatment notes and history. In this regard, Plaintiff argues that Dr. Canale's notes were, in fact, consistent with his opinions. (ECF No. 20 at 9) The Court does not read the ALJ's decision as suggesting that no aspects of Dr. Canale's opinions were consistent with his treatment notes. Rather, the ALJ's position was that Dr. Canale's opinions regarding the severity of Plaintiff's limitations were inconsistent with his treatment notes. For example, the ALJ noted that, although Dr. Canale stated Plaintiff's symptoms and signs (Tr. 436-37) included generalized persistent anxiety, emotional lability, and memory impairment, but those items are not supported by objective findings in Dr. Canale's treatment records. (Tr. 20)

Dr. Canale's notes also indicate that Plaintiff's condition improved with compliance. For example, Dr. Canale's progress notes from June 2011 indicate Plaintiff was not drinking and note no major issues. Plaintiff did not seek treatment again from Dr. Canale for almost six months, during which time Plaintiff stopped taking his medications. (Tr. 423)

The ALJ also found that Dr. Canale's opinions were inconsistent with Plaintiff's own

---

[15]  As noted above, staff at CenterPoint Hospital reported that Plaintiff "seemed more comfortable" when he believed he was not being observed, and "complained of significant symptoms in front of staff." (Tr. 240)

reports regarding his activities of daily living.  For example, Dr. Canale opined that Plaintiff would be extremely limited in his ability to work in coordination with or proximity to others without being distracted by them.  (Tr. 438)  Dr. Canale also opined that Plaintiff would have marked limitations in his ability to interact appropriately with the general public, and was unable to function outside of a highly supportive living environment.  (Tr. 438, 440)  The record, including Plaintiff's self-reported activities, in contrast, indicates Plaintiff functioned at substantially higher level than Dr. Canale's opinions suggest.  The record establishes that Plaintiff handled household chores, shopping and cared for himself without outside assistance. Plaintiff helped care for his elderly father, cleaned the house, handled laundry, and cut the grass. (Tr. 174-75)  In addition, although Plaintiff cannot drive due to his seizure disorder,[16] Plaintiff testified that that he has the ability to go out alone and does so, for example, when he shops for groceries on a weekly basis.  Plaintiff also obtained and held several jobs, at least on a short-term basis, and clearly exhibited the ability to function independently in this regard.  (Tr. 39,173, 176) See Miller v. Colvin, 784 F.3d 472, 478 (8th Cir. 2015) (accepting evidence of a plaintiff's daily activities as a source of contradictory evidence).

The ALJ also discounted Dr. Canale's opinions because they were internally inconsistent. Substantial evidence in the record supports this conclusion as well. Dr. Canale's first opinion reported that Plaintiff had "marked" limitations in "the ability to understand and remember very short and simple instructions," "the ability to carry out very short and simple instructions," and in "the ability to be aware of normal hazards and take appropriate precautions."  (Tr. 413-14)  In his second opinion, issued less than two months later, Dr. Canale opined that Plaintiff had only "mild" limitations in these three areas.  (438-39)  Similarly, in his first opinion, it was Dr.

---

[16] Aspects of the record suggest the reason Plaintiff does not drive is that he lost his license due to a DUI offense and lacks funds to get his license reinstated.

Canale's opinion that Plaintiff had "marked" limitations in "the ability to travel in unfamiliar places or use public transportation."  In his second opinion, however, Dr. Canale found that Plaintiff had only "moderate" limitations in this area.  (Tr. 414, 439)  Finally, Dr. Canale's second opinion indicated that Plaintiff suffered from marked limitations in many aspects of everyday life, such as his ability to set realistic goals or make plans independently, and his ability to sustain an ordinary routine.  (Tr. 438-39)  Yet Dr. Canale also opined that Plaintiff could manage his benefits in his own best interest.  For these reasons, the ALJ was justified in finding Dr. Canale's opinions internally inconsistent and, therefore, less credible.  See Perkins, 648 F.3d at 897-98 (inconsistent opinions undermine the credibility of even a treating physician's opinions).

The ALJ also discounted Dr. Canale's opinions because his latter, and more detailed opinion, included a significant factually inaccurate representation/assumption.  Dr. Canale stated that Plaintiff had three episodes of decompensation within twelve months, each lasting at least two weeks.  (Tr. 439)  This statement is inconsistent with the medical record which indicates that, in the twelve month period in question, Plaintiff had not experienced three episodes of decompensation lasting longer than two weeks.  Plaintiff does not contend that the ALJ erred with respect his consideration of the number of episodes of decompensation Plaintiff experienced.  Similarly, Dr. Canale stated that he had been treating Plaintiff monthly since July 2010, but the record indicates a six-month gap in treatment in 2011.  These factual errors also undercut the reliability of Dr. Canale's opinions.

Having considered the specific issues raised by Plaintiff, and having considered the evidence in the record, the Court concludes that "[t]he decision to discount Dr. [Canale's] opinion[s] is supported by substantial evidence on the record as a whole."  Miller, 784 F.3d at

478.  Even if the record would also support a contrary conclusion, because the ALJ chose a position supported by the record as a whole, the Commissioner's decision must be affirmed.  See Anderson, 696 F.3d at 793; Young, 221 F.3d at 1068.  Therefore, the ALJ did not err in weighing the mental health opinion evidence in this matter.  Accordingly, substantial evidence supports the ALJ's RFC determination and resulting conclusion at step four that Plaintiff could return to his past relevant work.

## V.     <u>CONCLUSION</u>

Therefore, for all of the foregoing reasons, the Court concludes that the Commissioner's adverse decision is based upon substantial evidence on the record as a whole, and the decision of the Commissioner will be affirmed.

Accordingly

**IT IS HEREBY ORDERED**, that the decision of the Commissioner is **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  31st   day of July, 2015.